UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

SAVANNAH NELSON,

Plaintiff,

Case No. 26-cv-
Hon.

v.

P.F. CHANG'S CHINA BISTRO, INC.,

Defendant.
_______________________________/

ERIC STEMPIEN (P58703)
MALLORIE M. BLAYLOCK-DANNA (P84331)
STEMPIEN LAW, PLLC
Attorneys for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
eric@stempien.com
mallorie@stempien.com
_______________________________/

**COMPLAINT AND JURY DEMAND**

Plaintiff, Savannah Nelson, by and through her attorneys, Stempien Law, PLLC, hereby complains against Defendant, P.F. Chang's China Bistro, Inc., and in support thereof states:

1. Plaintiff Savannah Nelson ("Nelson" or "Plaintiff") is a resident of the City of Plymouth, County of Wayne, State of Michigan.

2. Defendant, P.F. Chang's China Bistro, Inc. ("PFC" or "Defendant") is a foreign for-profit corporation which conducts systematic and continuous

business in the City of Livonia, County of Wayne, State of Michigan; its resident agent for service of process being: National Registered Agents, Inc., 40600 Ann Arbor Road E., Suite 201, Plymouth, MI 48170.

3. Jurisdiction is vested with this Court pursuant to 28 U.S.C. §1331, 42 U.S.C. §2000e, et. seq., and 28 U.S.C. §1367.

4. The events giving rise to this action occurred within the Eastern District of Michigan.

5. On or about December 12, 2025, Nelson filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6. On or about June 22, 2026, the EEOC issued a Dismissal and Notice of Rights letter to Nelson for her Charge of Discrimination.

**GENERAL ALLEGATIONS**

7. In or about March 2023, Nelson began her employment with PFC as a Server at the P.F. Chang's restaurant located at 17905 Haggerty Road, Livonia, Michigan 48152.

8. During her tenure as a Server, Nelson was subjected to harassment and retaliation based on her sex.

9. Throughout Nelson's employment, she was subjected to severe and pervasive sexual harassment, primarily by her supervisor and PFC Senior Manager, Bill Khoury ("Khoury"), as well as grooming behaviors.

10. Nelson's pre-employment interview was conducted by Khoury. At that time, Khoury was in his sixties, and Nelson was 20 years old.

11. Khoury hired Nelson within minutes of seeing what she looked like, did not conduct a normal interview, and bragged about how he would make Nelson successful.

12. Within the first month of Nelson's employment, Khoury began asking Nelson about her personal life, friends, and family.

13. Upon information and belief, PFC policy forbids management-level employees from contacting servers on their personal phones and instead requires that its managers communicate with servers via calling the PFC restaurant they work at, not the servers directly.

14. Khoury asked for Nelson's phone number, which she felt obligated to give him as her supervisor and manager.

15. Khoury put Nelson in his phone as "Nurse Betty," so no one at PFC would know it was Nelson.

16. In or about May 2023, Khoury told Nelson that he was not satisfied with only seeing her at work and he wanted to talk outside of work.

17. Khoury then told Nelson that she needed to call him, instead of him calling Nelson anymore. Nelson reluctantly agreed because she was going through a difficult, vulnerable time with her biological father.

18. Khoury would keep Nelson at the PFC restaurant after her shift to talk about her father.

19. Khoury bragged to Nelson about his sexual and/or dating relationships with former employees, how he dated multiple employees at once while he worked at Big Boy's, and a years-long relationship he maintained with a PFC server, Patricia, under PFC management's nose.

20. Upon information and belief, PFC policy forbids management-level employees from dating servers.

21. In or about May 2023, Nelson was sexually harassed and assaulted by a sous chef, Ken ("Sous Chef Ken").

22. Sous Chef Ken would try to encourage Nelson to go to his car with him after work.

23. Sous Chef Ken rubbed his hand up and down Nelson's leg while she was rolling silverware inside the PFC restaurant.

24. In or about late May 2023, Sous Chef Ken followed Nelson to her car after her shift and grabbed Nelson's buttocks.

25. Nelson reported Sous Chef Ken's sexual harassment to PFC's Operating Partner, Phil St. Pierre ("St. Pierre").

26. Sous Chef Ken's sexual harassment was investigated by PFC's Human Resources team ("HR") and Nelson was told to keep quiet.

27. Nelson complied, kept quiet, and did not tell anyone that she reported Sous Chef Ken to PFC.

28. During HR's investigation, in retaliation for reporting sexual harassment, Khoury and a Team Lead, Stacy ("Team Lead Stacy"), began calling Nelson "HR Queen."

29. In further retaliation, Nelson's coworkers followed suit and began calling her "HR Queen."

30. Sous Chef Ken was ultimately terminated after HR's investigation, on or about June 9, 2023, but not before he told Nelson's coworkers and management that Nelson was his girlfriend, they went on several dates, and they had sex in his car; none of which was true.

31. Khoury then bragged to Nelson that he helped Sous Chef Ken secure a new job at a personal friend's restaurant.

32. Within the first 6 months of Nelson's employment, Khoury began encouraging Nelson to invite her mother, Sheri Hull, stepfather, Chris Hull, (collectively "Nelson's parents"), and her grandfather to PFC so that Khoury could meet them.

33. Khoury doated upon Nelson's family when they came to the restaurant to eat; he always comped their meals and made a big showing to them, trying to show how important he was.

34. Khoury referred to himself as "The Messiah of P.F. Chang's."

35. Khoury began calling Nelson's grandfather, inserted himself into Nelson's family right away, and began socializing with Nelson's grandfather at her grandfather's house.

36. Within the first 6 months of Nelson's employment, Khoury repeatedly showed Nelson a photo of a young blonde woman in blue lingerie sitting on a hotel bed, and he bragged to Nelson about having sex with her.

37. In Nelson's presence, and on multiple occasions throughout Nelson's employment, Khoury discussed with male PFC servers how the woman in blue lingerie was a prostitute he had solicited in Las Vegas.

38. Khoury frequently made inappropriate sexual comments both in person and over text messages.

39. Khoury would tell Nelson "you're so beautiful," "you're so gorgeous," and that he was "looking to trade up."

40. Khoury often bragged to Nelson that he was "a player."

41. When Khoury would joke with Nelson, it would almost always be about masturbating.

42. When Nelson did not wear make up at work, Khoury would ask if "Covergirl is on strike" or "Mabeline is on strike," which caused Nelson to wear make-up at work because she felt obligated to.

43. Khoury and male PFC servers had a ranking system which ranked the female PFC servers by how good looking Khoury and male PFC servers thought the female PFC servers were.

44. Nelson learned that she was in the top 5 of the ranking system when she wore make up.

45. Nelson learned of a rumor that Shottin ("Shottin"), a server, was dating St. Pierre against company policy.

46. Nelson learned that Shottin always ranked #1 in the ranking system.

47. Khoury only hired young women that he considered attractive.

48. Khoury would remove certain female employees from working behind the bar because he did not want the ones that he deemed unattractive to be behind the bar.

49. On or about June 30, 2023, Khoury attended Nelson's grandfather's 80th birthday party where Khoury told Nelson's parents that he was looking for a younger woman to marry, "age gaps are normal," and "I have the grandfather's approval, what more do I need?"

50. In the Fall of 2023, Khoury took Nelson's phone from her, looked through it without her permission, and when Khoury gave Nelson her phone back, a photo of Nelson with her shirt undone and exposed bra was on the screen. Khoury thought it was funny and laughed.

51. Throughout Nelson's employment, Khoury would call Nelson and/or required her to call him after her shifts.

52. Khoury and Nelson's phone conversations would often last 1-2 hours or more, and continued into the early morning hours.

53. Khoury would text message Nelson at all hours of the day and night.

54. Khoury would become irritable and dismissive at work when Nelson refused to call him or did not call him when he wanted her to.

55. In or about August 2023, Nelson was in a car accident and her vehicle was totaled.

56. Khoury offered to drive Nelson to/from work, which she accepted because she did not have alternative transportation.

57. Khoury would make Nelson walk across the street from the PFC restaurant to meet him at his car, so as to avoid PFC learning that he was providing transportation for Nelson.

58. During these car rides, Khoury would state extremely inappropriate things, but he knew Nelson needed a ride to work and would not complain as a result. For example, Khoury told Nelson that he was in the PFC parking lot "jacking off."

59. When Nelson began shutting Khoury out of her life, he hired younger and impressionable females as servers and Nelson saw Khoury repeat the same grooming pattern with them that he did with her.

60. Once Nelson began looking for a dating relationship, Khoury made sure to be involved.

61. Khoury would talk to Nelson about her dating life, tell her that the person she was seeing was not her type, and tried to keep Nelson from dating.

62. On or about January 8, 2024, when Nelson was in the back of the PFC restaurant, Khoury grabbed a water off Nelson's tray, poured it on her chest, and yelled, "Wet t-shirt contest! Wet t-shirt contest!" He then said Nelson would "suck at a wet t-shirt contest." Nelson was mortified and worked the rest of her shift in a wet t-shirt.

63. In or about January or February 2024, Khoury became hostile toward Nelson when she entered a dating relationship with a man her age.

64. Khoury would become upset with Nelson for not calling him.

65. Nelson was afraid to go to work because she did not know how Khoury would treat her.

66. Nelson's family and boyfriend stopped going to PFC because they did not feel comfortable around Khoury.

67. On or about June 9, 2024, Khoury had Sous Chef Ken return to PFC.

68. Khoury intentionally paraded Sous Chef Ken through the restaurant, directly passed Nelson, which caused Nelson to have a panic attack.

69. Khoury knew Nelson was working at the time he told Sous Chef Ken to come to the restaurant and Khoury did not warn Nelson that Sous Chef Ken was going to be there.

70. In 2024, Nelson underwent mental health treatment as a result of her employment conditions and her therapist recommended that she leave her employment with PFC.

71. In 2024, once Nelson turned 21, Khoury constantly asked her to go to dinner and drink with him.

72. Once Nelson turned 21, Khoury would schedule her to close on days that she worked doubles.

73. Standard PFC practice would have been that Nelson would have been ‘cut’ first, not last, on days she worked doubles, but Khoury did this so that he could get Nelson alone to talk to her after hours.

74. Nelson told Khoury that she would not be comfortable drinking or dining with him.

75. When Nelson refused to drink and dine with Khoury, he would become upset and angry at Nelson.

76. In or about May 2024, Khoury told Nelson's male coworkers to "be nicer to her while she's on her period," when discussing a cis-gendered female server.

77. On or about June 2, 2024, during one of the many calls Khoury pressured Nelson to make to him, she confronted him for being misogynistic and sexist, as well as for his comments about Nelson's inability to perform basic job responsibilities based on the fact that she is a woman.

78. In or about the Fall of 2024, Khoury excluded Nelson from participating in PFC's fantasy football.

79. Jonah, a male server, tried to let Nelson participate in PFC's fantasy football, but Khoury said he would not play if Nelson was allowed to.

80. Nelson ultimately did not participate in PFC's fantasy football.

81. Because of the retaliation Nelson suffered after reporting Sous Chef Ken for sexually harassing her, Nelson knew she could not report Khoury to PFC without facing further harassment and retaliation.

82. Nelson could not handle Khoury's sexual harassment or retaliation any longer and she reported Khoury to Team Lead Stacy in or about December 2024 or January 2025.

83. Nelson informed Team Lead Stacy about some of the inappropriate behavior Khoury had displayed, such as the pressured phone calls, arranged meet ups, keeping Nelson until or past closing time, befriending Nelson's family, how

his demeanor shifted once Nelson began dating her boyfriend, and the comments about his aspirations to date younger females.

84. Nelson hoped that Team Lead Stacy would protect her; instead, Nelson was instructed to *not* report Khoury to HR.

85. Following Nelson's reporting of Khoury to PFC, Khoury became so cold toward Nelson at work that she could not go to him for anything work-related, and she was no longer given her preferred choice in shifts to work.

86. Soon thereafter, Nelson informed PFC that she would be leaving in or about March 2025 to pursue her nursing career.

87. Nelson worked her last shift for PFC in or about the first week of March 2025.

88. On or about August 17, 2025, Jonah, who was seeking to secure Khoury's position at PFC once Khoury retired, messaged Nelson on Khoury's behalf. Jonah knew where Nelson lived, which was a place different from where she lived when Khoury drove her to/from work.

89. Nelson explicitly told Jonah not to tell Khoury where she lived.

90. Upon information and belief, Jonah informed Khoury where Nelson lived.

91. On or about September 15, 2025, as Nelson was walking her grandfather out to his car from Nelson's residence, she saw Khoury drive by.

92. Khoury made eye contact with Nelson and drove away.

93. Nelson called the Livonia Police Department within an hour of this stalking incident and filed a police report.

94. The Police confirmed that the license plate on the vehicle matched Khoury's and that it was Khoury.

95. Nelson declined to pursue the matter further because she was afraid of what Khoury would do in retaliation and is afraid that Khoury knows where she lives.

96. As a result of Khoury exhibiting stalking behaviors, Nelson and her family spent hundreds of dollars on security cameras and floodlights for Nelson's residence.

97. On or about September 16, 2025, Nelson's parents contacted PFC's regional manager, Brooke Filcek ("Filcek"), about the same and Filcek stated that someone from HR would contact Nelson.

98. On or about November 6, 2025, Tammy Chan, HR Business Partner from PFC's Global Support Center, finally tried to contact Nelson, via a letter mailed to her home, which demanded that Nelson contact PFC by November 20, 2025 if she was still interested in having her concerns reviewed.

99. Nelson declined to renew contact with PFC.

100. Upon information and belief, no corrective action was ever taken against Khoury.

101. Nelson would not have been subjected to the sexual conduct or communication but for the fact of her sex.

102. Nelson did not solicit or entice the sexual conduct or communication.

103. PFC failed to take any corrective action and the sexual harassment continued.

104. As a direct result of PFC permitting the hostile work environment and sexual harassment to continue, Nelson was constructively discharged and suffered severe emotional distress.

105. The disciplinary actions taken against Nelson prior to her constructive discharge were all because of her reporting and opposing sexual harassment.

106. PFC's constructive discharge of Nelson was pretext for discharging her from her employment because she reported and opposed violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. §37.2101 et seq.

## COUNT 1 – VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT (SEXUAL HARASSMENT)

107. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

108. At all material times, Plaintiff was an employee, and Defendant was her employer, covered by and within the meaning of 42 U.S.C. §2000 *et seq.*

109. Plaintiff was sexually harassed by Defendant's agents and employees throughout the course of her employment, including but not limited to

unwelcome comments and conduct of an offensive and sexual nature directed at Plaintiff and the creation of a hostile work environment, as fully articulated herein above.

110. Plaintiff complained about the harassment and the events described above to Defendant.

111. The sexual harassment was severe and pervasive.

112. Defendant did not promptly remedy ongoing sexual harassment when Plaintiff complained.

113. Defendant permitted the sexual harassment to continue.

114. The conduct of Defendant's agents and employees in sexually harassing Plaintiff constitutes sexual harassment and discrimination in violation of 42 U.S.C. §2000 *et seq.*

115. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to, lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorney fees.

**COUNT 2 – VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT (RETALIATION)**

116. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

117. Plaintiff engaged in protected activity when she complained to Defendant about the sexual harassment by Defendant's employees, as fully described above.

118. Plaintiff's protected activity was known to Defendant.

119. Defendant failed and refused to take any action regarding the sexual harassment of Plaintiff.

120. Plaintiff suffered adverse employment actions, including but not limited to reprimand, bullying, and constructive discharge.

121. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

122. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to, lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorney fees.

## COUNT 3 – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (SEXUAL HARASSMENT)

123. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

124. At all material times, Plaintiff was an employee, and Defendant was her employer, covered by and within the meaning of the ELCRA.

125. Plaintiff was sexually harassed by Defendant's agents and employees throughout the course of her employment as fully explained herein, constituting disparate treatment of, and impact on, Plaintiff.

126. The sexual harassment was severe and pervasive.

127. Plaintiff complained about harassment and the events described herein to Defendant.

128. Defendant did not promptly remedy the ongoing sexual harassment when Plaintiff complained.

129. Defendant permitted the sexual harassment to continue.

130. The conduct of Defendant's agents and employees in sexual harassing Plaintiff constitutes sexual harassment and sex discrimination in violation of the ELCRA.

131. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorney fees.

**COUNT 4 – VIOLATION OF THE ELLIOT LARSON CIVIL RIGHTS ACT (SEX DISCRIMINATION)**

132. Plaintiff hereby incorporates by reference and realleges all previous paragraphs of this Complaint as if fully set forth herein and further states that:

133. The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment,

because of the employee's sex. M.C.L. §37.2202(1)(a); M.C.L. §37.2103(i) ("Discrimination because of sex includes sexual harassment.").

134. "Employer" is defined as a "person," which includes a corporation. M.C.L. §37.2103(g).

135. "Employer" also includes an "agent of that person." M.C.L. §37.2201(a).

136. Defendant was, during all relevant times, Plaintiff's employer.

137. Khoury, as an agent of Defendant's, was, during all relevant times, Plaintiff's employer.

138. Defendant, through its agents and employees, subjected Plaintiff to unwanted and unlawful verbal and physical sexual advances and contact because she was a female.

139. The ELCRA also prohibits employers from segregating or classifying employees in a way that would tend to deprive them of opportunities on the basis of their sex. M.C.L. §37.2202(1)(b).

140. Defendant maintained unofficial policies and practices of encouraging Plaintiff to excessively communicate and socialize with her supervisor, Khoury; disallowing Plaintiff from speaking about her reporting sexual harassment; bullying Plaintiff if she did not wear make up to work; allowing Khoury to engage in grooming and stalking behaviors; discouraging Plaintiff from entering into dating relationships; disallowing Plaintiff from

participating in PFC's fantasy football league because she is female; and otherwise subjecting Plaintiff to unwanted and unlawful verbal and physical sexual advances and contact.

141. Defendant's unofficial policies and practices served to exclude Plaintiff from valuable professional and personal development opportunities on the basis of her sex.

142. As a result of this discrimination, Plaintiff lost out on the opportunity to make new professional contacts in her field, to be free from verbal and physical sexual advances, to be gainfully employed, to earn and save money for her future, and to establish trusting relationships with persons in supervisory and authoritative positions, among others.

143. As a result of this discrimination, Plaintiff was subject to verbal and physical sexual actions and conduct when other servers were not.

144. As a result of this discrimination, Plaintiff was the victim of grooming behaviors and stalking.

145. As a result of this discrimination, Plaintiff was constructively discharged from her employment.

146. As a result of this discrimination, Plaintiff was subject to humiliation, embarrassment, and objectification.

147. Plaintiff requests relief in her favor and against Defendant as follows:

a. declare that Defendant's policies and practices as fully explained herein above unlawfully segregate and classify employees because of sex;

b. enjoin Defendant from continuing said policies and practices;

c. award damages to Plaintiff that reflect her economic losses;

d. award Plaintiff compensatory damages for her humiliation;

e. award Plaintiff punitive damages reflecting the blatant disregard Defendant demonstrated for Plaintiff's rights under the ELCRA;

f. award Plaintiff attorney fees, witness fees, and costs; and

g. grant any other relief the court deems appropriate or necessary.

**COUNT 5 – SEXUAL HARASSMENT (HOSTILE SEXUAL ENVIRONMENT)**

148. Plaintiff hereby incorporates by reference and realleges all previous paragraphs of this Complaint as if fully set forth herein and further states that:

149. Plaintiff belongs to a protected group.

150. Plaintiff was subjected to communication and conduct on the basis of sex.

151. Plaintiff was subjected to unwelcome sexual conduct and communication.

152. The unwelcome sexual conduct and communication was intended to or in fact did substantially interfere with Plaintiff's employment or created an intimidating, hostile, or offensive work environment.

153. Defendant's employees' sexual statements, advances, touching, conduct, and communications were offensive to Plaintiff and would have been offensive to a reasonable person.

154. These circumstances created a sexually hostile environment and constitute sexual harassment.

155. Defendant had actual knowledge and reason to know of its employees' sexual harassment.

156. Defendant and others took no action to investigate or to protect Plaintiff despite having actual knowledge of sexual harassment.

157. By an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.

158. Defendant had adequate and reasonable notice of the harassment and failed to take appropriate corrective action.

159. Defendant is liable under the doctrine of respondeat superior.

160. Defendant provided Plaintiff with no reasonable avenue for relief.

161. Plaintiff was constructively discharged from her employment when the sexual harassment persisted.

162. As a proximate result, Plaintiff suffered economic and non-economic damages.

163. As a proximate result, Plaintiff has suffered and may continue to suffer mental and emotional distress.

164. As a proximate result, Plaintiff suffered injury and damage, past, present, and future, including but not limited to:

a. pain, suffering, and emotional distress;
b. humiliation, mortification, and embarrassment;
c. medical expense;
d. actual wage loss and lost earning capacity; and
e. other injuries and damages and consequences that are found to be related which develop or manifest themselves during the course of discovery and trial.

**<u>COUNT 6 – SEXUAL HARASSMENT (QUID PRO QUO HARASSMENT)</u>**

165. Plaintiff hereby incorporates by reference and realleges all previous paragraphs of this Complaint as if fully set forth herein and further states that:

166. Plaintiff belongs to a protected group.

167. Plaintiff was subjected to communication and conduct on the basis of sex.

168. Plaintiff was subjected to unwelcome sexual conduct and communication.

169. Submission to, or rejection of, sexual statements, advances, touching, conduct, and communications were used as factors in decisions relating to Plaintiff's job benefits.

170. Plaintiff was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors.

171. Plaintiff's submission to the unwelcome advances was an express or implied condition for receiving job benefits.

172. Plaintiff's refusal to submit to sexual advances resulted in a tangible job detriment.

173. Khoury was in a position to offer tangible job benefits in exchange for sexual conduct or, alternatively, to threaten tangible harm for a failure to submit to the prohibited conduct or communications.

174. Khoury's sexual statements, advances, conduct, and communications were made in his capacity as an agent of Defendant's.

175. These circumstances, as fully explained herein, constitute quid pro quo sexual harassment.

176. Defendant is strictly liable for the conduct of its supervisory employees, including Khoury, because he has authority over hiring, advancement, dismissal, and discipline.

177. Defendant is strictly liable for the quid pro quo harassment of Plaintiff.

178. As a proximate result of the quid pro quo harassment, Plaintiff suffered economic and non-economic damages.

179. As a proximate result of the quid pro quo harassment, Plaintiff has suffered and may continue to suffer mental and emotional distress.

180. As a proximate result of the quid pro quo harassment, Plaintiff suffered injury and damage, past, present, and future, including but not limited to:

a. pain, suffering, and emotional distress;
b. humiliation, mortification, and embarrassment;
c. medical expense;
d. actual wage loss and lost earning capacity; and
e. other injuries and damages and consequences that are found to be related to the assault and battery that develop or manifest themselves during the course of discovery and trial.

**COUNT 7 – VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT (RETALIATION)**

181. Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further states that:

182. Plaintiff engaged in protected activity when she complained to Defendant about the sexual harassment by Defendant's employees, as fully described above.

183. Plaintiff's protected activity was known to Defendant.

184. Defendant failed and refused to take any action regarding the harassment of Plaintiff.

185. Plaintiff suffered adverse employment actions, as fully articulated herein.

186. There is a causal connection between the protected activity and the adverse employment actions taken against Plaintiff.

187. As a result of the foregoing, Plaintiff has suffered damages, including but not limited to lost past and future wages, lost past and future employment benefits, loss of earning capacity, severe emotional distress, costs and attorney fees.

WHEREFORE, Plaintiff SAVANNAH NELSON prays that this Honorable Court enter a judgment in her favor against Defendant P.F. CHANG'S CHINA BISTRO, INC. in an amount that this Court deems fair and just, plus costs, interest, and attorney fees.

**JURY DEMAND**

Plaintiff, Savannah Nelson, hereby demands a trial by jury of the within cause.

Respectfully submitted,

STEMPIEN LAW, PLLC

*/s/ Mallorie M. Blaylock-Danna*
Mallorie M. Blaylock-Danna (P84331)
Attorney for Plaintiff
38701 Seven Mile Rd., Suite 445
Livonia, MI 48152
P/F: 734-744-7002
mallorie@stempien.com

Dated: September 16, 2026